In the Matter of PAUL E. TUTHILL, an Attorney, Respondent.

First Department, March 17, 1939.

*Edwin M. Otterbourg, John Kirkland Clark* and *Frederic P. Houston* of counsel [*George R. Adams*, attorney], for the petitioner.

*Ralph Montgomery Arkush*, for the respondent.

MARTIN, P. J.   The respondent, Paul E. Tuthill, is charged with participating in and aiding the unlawful practice of the law by a corporation.

In 1924 a New York corporation, known as Transatlantic Estates & Credit Company, Inc., was organized by one Joseph Woerndle, who was admitted to the practice of the law in the State

of Oregon on June 15, 1909, but had been suspended from practice in that State from December 11, 1923, to June 11, 1924. Applications made by him for admission to the bar in this State were rejected by the committee on character and fitness of the Appellate Division Supreme Court, First Department, on May 7, 1925, December 27, 1927, April 15, 1928, and May 13, 1930.

The objects of the corporation, as stated in the certificate, were " to represent through power of attorney, or otherwise, individuals or estates, co-partnerships, corporations, heirs, legatees, distributees and devisees in the cashing, collection or disposal of the claims, rights or money due in this country, or foreign countries, and to exercise any and all other powers which a corporation, co-partnership or natural persons could do or exercise, and which now or hereafter may be authorized by law, not inconsistent with the purposes and powers herein specifically stated."

After organization the corporation employed and paid agents to search the records of the Surrogates' Courts in the metropolitan area and to furnish it with the names of intestate estates. The work of the corporation consisted of locating and identifying next of kin or legatees residing abroad; obtaining from such next of kin or legatees authorization to represent and prosecute their claims to participate in the distribution of the intestate estate; preparing a family tree and explanatory statement of relationship; assembling birth, marriage and death certificates and other genealogical data required by the estate representative; submitting the required proofs of the estate representative; keeping in touch with the estate representative as to the progress of the administration and transmitting the information abroad; discussing with the estate representative the possibility of advances to the beneficiaries; approving or questioning bills for funeral and other expenses of the estate; transmitting or disposing of personal effects of the decedent; investigating and discussing with estate representative claims of creditors and alleged gifts of personal property; examining proposed final account and scheme of distribution; waiving citation upon judicial settlement of final account; executing receipt and release upon distribution; transmitting funds abroad.

In connection with the authorization to represent claimants, a power of attorney was obtained under which the corporation was authorized " to institute, conduct and defend all suits in equity or actions at law, and any and all proceedings, contests and actions of whatsoever kind which may in any way concern the subject matter of this instrument [the power of attorney], to retain and discharge counsel; * * * to institute, appear in or compromise any lawful or necessary suit, action or proceeding begun to probate

the last Will of said decedent, and to administer, settle or close said estate; to enter my appearance and waive the issuance and service of any and all citations therein, in all proceedings, as well as summonses or mandates on any accounting, or of any and all proceedings whatsoever in any way relating to the estate of said decedent; to accept service of any process in my behalf and to consent to the entry of any and all orders or decrees of any court, and I hereby authorize said Attorney-in-Fact to convert any and all property received as my distributive share or shares, legacy or bequest into cash, and to endorse my name upon all checks, drafts, or other negotiable instruments made payable to me or my order; to compromise claims, actions or proceedings, and to execute and deliver receipts, releases, general or special acquittances, assignments, deeds, conveyances and quit claims, and/or all other suitable instruments in writing; and to institute any proper, suitable or necessary proceedings, suits or actions to protect my interest in said estate or otherwise."

Wherever necessary, the corporation employed an attorney to render the following services: To object to claims of creditors or persons alleging gifts or to fees or expenses; to petition for compulsory accounting; to withdraw funds deposited for account of beneficiaries in public offices; to file petitions for appointment of an ancillary administrator, guardian or committee of an incompetent; to participate in a will contest.

During the year 1927, following a complaint with respect to the activities of the corporation, the committee on unlawful practice of the law of the New York County Lawyers' Association initiated an investigation looking to the dissolution of the corporation for violation of section 280 of the Penal Law. In the course of that investigation testimony was given by Woerndle making it clear that the corporation had been formed for the purpose of avoiding the interdiction against solicitation of business by attorneys. Failing in its efforts to bring about a change in attitude with respect to its business, the corporation authorized the respondent to bring about its dissolution.

In March, 1930, the New York County Lawyers' Association committee was advised of the complete dissolution of the corporation by a letter from the respondent, in which was inclosed an advertisement stating that the corporation had been dissolved at the request of the committee on unlawful practice of the law of the New York County Lawyers' Association. It was not disclosed, however, that, on the advice of the respondent, a new corporation had been organized in New Jersey on January 14, 1930, bearing the same name as the New York corporation and which was formed

with the intention of carrying on from New Jersey the business which had been considered a violation of the New York Penal Law.

The activities of the New Jersey corporation received severe condemnation in *Matter of Wellington* (154 Misc. 271). Mr. Surrogate FOLEY stated:

" The New York corporation was actually dissolved in February, 1930, but the promise of an abandonment of the business by Woerndle and his attorney Tuthill was a mere sham and pretense, for within a few months a New Jersey corporation of the same name was formed which carried on the same business in the same flagrant manner. Woerndle and his corporation simply transferred their place of business from New York to New Jersey. The same method of searching, solicitation and the collection of exorbitant and unreasonable amounts has been continued for the past four years in New York State. Tuthill testified that since 1930 he has represented the Transatlantic Estates or Woerndle in approximately forty-nine estates in this court under powers of attorney made by foreign heirs to the New Jersey corporation or to Woerndle. His activities since the dissolution of the New York corporation have been no different from his representation of the New York corporation in the preceding years. Tuthill received out of the compensation paid to the corporation a fixed percentage for his own services. \* \* \*

" In the present case I hold that the Transatlantic Estates and Credit Company was engaged in the practice of law, and for that reason any agreements obtained by it to represent foreign heirs, and any powers of attorney procured by it, are illegal and void."

This proceeding is a result of the censure of the respondent expressed in the opinion of the surrogate in *Matter of Wellington* (*supra*).

Apart from any question of the Penal Law, public policy does not permit a corporation to directly or indirectly engage in the practice of the law.

In *Matter of Maclub of America, Inc.* (—— Mass. ——; 3 N. E. [2d] 272) it appeared that a corporation sold to motorists memberships under contract entitling members, among other things, to the benefit of the corporation's " legal defense," under which the corporation agreed to furnish; at its expense, " consultations and advice in any case pertaining to the use of the automobile, legal defense of members in any civil suit arising from the use of a member's automobile that may involve property damage, legal defense of claims for personal injuries where members are not insured," and " legal defense in the courts of members charged with violating

any automobile law, any city ordinance or any police regulation, including alleged manslaughter." Chief Justice RUGG, writing for the court, said:

" The terms of the contract between the respondent and its members bound the respondent in plain terms, for the consideration paid it, to furnish them services which can be rendered by members of the bar alone and which require the practice of law. * * * There is no ambiguity about the nature and identity of the agreement made and the responsibilities assumed by the respondent. Its contractual duty could be met only by members of the bar in the practice of their profession. This feature of the agreement made by the respondent is stressed in its advertisements. The use of commercial methods of advertising for attracting those who may require the services of members of the bar for the protection of their rights is contrary to the standards required of members of the bar and incompatible with their duty to the court. * * *

" The relation of attorney and client does not exist between those who hold membership in the respondent and the members of the bar who conduct their legal defense. The relation is between the respondent and the attorney. * * * Those who perform the contractual obligations of the respondent are its attorneys. From it they receive their compensation. To its instructions they are subject. The respondent is the principal throughout the transaction with the attorneys. It can discharge or change them at will. Commonly an attorney and client alone are the parties interested in the relationship. The intervention of the respondent, who employs the attorney, gives a different character to the relationship. It ceases to be highly confidential and fiduciary."

It was there held that the corporation was practicing law and violating laws essential to the protection of the public.

In *Richmond Association of Creditmen, Inc.*, v. *Bar Association of City of Richmond* (167 Va. 327; 189 S. E. 153) it appears that a credit association selected attorneys to make collections for customers and fixed fees therefor. Practically all correspondence and remittances passed through the association and the association otherwise controlled attorneys and shared compensation without customers even knowing the identity of attorneys engaged. It was held that the corporation was engaged in the unlawful practice of the law in violation of the Virginia statute and public policy.

In *State ex rel. McKittrick* v. *Dudley & Co., Inc.* (340 Mo. 852; 102 S. W. [2d] 895) the corporation was chartered to do a general collection and adjustment business. It collected or attempted to collect liquidated commercial accounts for an agreed contingent compensation; it solicited such business by personal calls and by letters,

and represented to prospective customers that it was in a position to collect accounts through its agents and associated attorneys. When it became necessary to send the account to an attorney the corporation selected him and made arrangements for his fee and carried on all the correspondence between the attorney and the creditor. In its letter to debtors the corporation threatened to resort " to measures that would affect your credit standing or embarrass you commercially," and the letter also stated that, unless payment was made, " we shall take steps to make the collection." Upon failure to pay the account the corporation selected an attorney and sent the claim to him for collection. The corporation selected all attorneys to whom collections were sent. Following the institution of a quo warranto proceeding the corporation changed, in some slight degree, its method of doing business. It was contended on behalf of the corporation that, in conducting its business, it did not practice law or conduct a law business, as those terms are defined, either under a statutory definition or as they are defined under the inherent powers of the court. It was held that under either definition the practice of law is not confined to actual appearance in court, and, on the facts recited, the court had no doubt that the corporation was engaged in the practice of the law, saying: " While it did not file any suits to enforce the collection of the account, it selected the attorney and held itself out to its customer that if it could not collect the account without legal process it would enforce the collection through the use of associate attorneys. It is to be remembered that the respondent selects the attorney to file the suit. It tells him in advance what his fee will be if he is successful in making the collection. It is true the attorney could refuse to take the collection on the fee named, but if he did, he knows the claim will probably be sent to another attorney. All communications from the attorney are sent to the respondent and not the client. In handling the correspondence that passed through its hands it occupies the position of a censor. The confidential relation between attorney and client is lacking. In short, the attorney is the agent of the respondent, and not of the client. The duty the attorney owes his client is thereby destroyed, because the attorney's devotion to the client's interest is not uninfluenced by the duty he owes the respondent. This relationship was condemned in the case of *People* v. *Peoples Trust Co.*, 180 App. Div. 494; 167 N. Y. S. 767, 768."

Passing on the question of the right of a lay person to be appointed an agent to select an attorney for a third person, the court in the above case said:

" But as we see the facts in this case, that is not what the respondent does. It does not act as a mere agent in selecting an

attorney for the creditor. In the first place the respondent receives claims for collection and those claims, that it is unable to collect, it turns over to an attorney for collection and it retains an interest in the fee paid by the creditor. Legal ethics prohibits the lawyer from soliciting the claims, but in the case at bar the respondent, a corporation, solicits the claims and turns them over to an attorney to institute legal proceedings to enforce the collection of these claims, which the respondent does not have the power to do. *Midland Credit Adjustment Co.* v. *Donnelley*, 219 Ill. App. 271, 277.

" In other words, one can employ an attorney through a lay agent or agency, if the attorney is solely responsible to the client, but the agent or agency does not have a right to make a business of soliciting claims, and then farming them out to lawyers for collection as the respondent does in conducting its business."

This court, in *Matter of Newman* (172 App. Div. 173, 180), said: " We are clearly of the opinion that the relation was one which this court cannot sanction or approve. An attorney of record will not be permitted to deny that the relation of attorney and client exists between himself and the person for whom he appears and conducts litigation. Nor can this court sanction the splitting of fees by an attorney with a layman or a corporation or a voluntary association not authorized to practice law, as an inducement or reward for the procuring of business."

The sole business of the corporation here involved was searching out and procuring claims to be enforced, if necessary, in court, and furnishing counsel and legal advice in connection therewith. Any such corporation which regularly undertakes to collect legacies and distributive shares in estates of decedents in this State is engaged in the practice of the law.

The respondent was familiar with the character of the business of the corporation and its method of obtaining such business. His association commenced in 1926, when he was retained by the New York corporation to represent it in an estate in which it was attorney in fact of beneficiaries. In the investigation conducted by the committee of the New York County Lawyers' Association, he represented the corporation and endeavored to have the committee take a passive attitude. Having been unsuccessful, it was decided to dissolve the New York corporation. On respondent's advice, the New Jersey corporation was organized. The inference is warrantable that the dissolution of the New York corporation and the organization of the New Jersey corporation were intended to avoid a criminal prosecution in this State.

The record leaves no doubt that respondent was aware of the fact that the corporation obtained its business through solicitation.

As an attorney, respondent could not himself so solicit. In accepting engagements from the corporation, respondent was doing indirectly what he could not ethically do directly. Respondent was retained by the corporation in about one hundred and fifty-six matters, in about fifty-six of which it was necessary to file notices of appearance in court; the gross amount collected by the corporation in these matters was $451,491.38, of which it retained $44,559.99, and paid respondent $16,225.96.

The relationshop of attorney and client did not exist between respondent and those for whom he appeared as attorney of record. He was, in reality, the attorney for the corporation which selected and employed him, to which he accounted and which fixed his compensation.

He wholly disregarded the 35th Canon of Professional Ethics of the American Bar Association, which provides as follows: " The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries."

The high standard of service required of every lawyer was stated in *Matter of Co-operative Law Co.* (198 N. Y. 479), where it was said: " The relation of attorney and client is that of master and servant in a limited and dignified sense, and it involves the highest trust and confidence. It cannot be delegated without consent and it cannot exist between an attorney employed by a corporation to practice law for it, and a client of the corporation, for he would be subject to the directions of the corporation and not to the directions of the client. There would be neither contract nor privity between him and the client, and he would not owe even the duty of counsel to the actual litigant. The corporation would control the litigation, the money earned would belong to the corporation and the attorney would be responsible to the corporation only. His master would not be the client but the corporation, conducted it may be wholly by laymen, organized simply to make money and not to aid in the administration of justice which is the highest function of an attorney and counselor at law. The corporation might not have a lawyer among its stockholders, directors or officers. Its members might be without character, learning or standing. There would be no remedy by attachment or disbarment to protect the public from imposition or fraud, no stimulus to good conduct from the traditions

of an ancient and honorable profession, and no guide except the sordid purpose to earn money for stockholders. The bar, which is an institution of the highest usefulness and standing, would be degraded if even its humblest member became subject to the orders of a money-making corporation engaged not in conducting litigation for itself, but in the business of conducting litigation for others. The degradation of the bar is an injury to the State."

The corporation could not function without the aid of an attorney. The respondent, knowing this, willingly and, in view of his counseling formation of the New Jersey corporation, we may say, deliberately aided it in its unlawful practice of the law. For this prostitution of his profession, the high standards of which must be maintained, he should be disbarred.

TOWNLEY, DORE, COHN and CALLAHAN, JJ., concur.

Respondent disbarred.